FILED

2012 Nov-07  PM 04:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **BENITA TAUNTON**, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **2:11-CV-00368-KOB** |
| | ) | |
| **NOLAND HEALTH SERVICES, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

This case, alleging race discrimination and retaliation, comes before the court on Defendant Noland Health Services, Inc.'s Motion for Summary Judgment. (Doc. 18). The Plaintiff did not respond to the Motion. For the reasons stated below, the court finds that Defendant's Motion is due to be GRANTED in its entirety.

## <u>STATEMENT OF FACTS</u>

Because Taunton did not object to or in any way dispute the Defendant's statement of facts, the court accepts those facts as undisputed pursuant to Rule 56(c & e) of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 56(c & e); *see also* Appendix II - Summary Judgment Requirements, subsection.D.2.a, found at <u>www.alnd.uscourts.gov</u>.

### *Taunton's Work History with NHS*

Defendant Noland Health Services, Inc. ("NHS") is an Alabama corporation operating full service senior living facilities and long-term acute-care hospitals across the state. Through its hospital division, NHS operates Noland Hospital Birmingham ("NHB"), located on the eighth floor of St. Vincent's Hospital East. NHB cares for very sick patients with complex illnesses.

Many patients have suffered multiple systems failure; many receive intravenous medicine, or have a central line because their veins are too weak for a traditional IV; and many are on a ventilator.  NHS has policies prohibiting discrimination, harassment, and retaliation, and an employee handbook communicates those policies to its employees.

In May 2003,  NHS hired the Plaintiff, Benita Taunton, an African American, as a Licensed Practical Nurse.  Further, NHS provided tuition assistance to Taunton for her RN studies and, as a result of her studies, Taunton received a RN license.  In May of 2008, NHS promoted her to RN status and pay.  Taunton acknowledged that she "probably read" the handbook policies and accessed and read NHS's "Harassment in the Workplace" policy.

During her tenure with NHS from 2003 to 2010, Taunton had a number of supervisors. The facts presented only provide the race of one of Taunton's supervisors, Melissa Austin, who is white; however, Taunton's Second Amended Complaint states that NHS's management team was all white.  The person holding the position of Nurse Manager was Taunton's direct supervisor as well as the direct supervisor of all nursing staff at NHB, and the Nurse Manager would report to the Director of Clinical Services ("DCS"), who supervises all clinical care, including both nursing and therapeutic care.  NHS hired Amber Davis as NHB's Nurse Manager in October 2008. In November 2008, after promoting Amber Davis from Nurse Manager to DCS, NHS hired Melissa Austin as NHB's Nurse Manager.  Taunton does not contend that she experienced discrimination or retaliation prior to the hiring of Davis and Austin in the fall of 2008. Taunton admits that during her tenure with NHS she never heard derogatory language about blacks nor did she hear any derogatory comments about "whistle-blowers" generally or those who filed EEOC charges.  Laura Wills has been the NHS's Administrator since May 2010.

2

The evidence reflects that Taunton has had difficulty getting along with co-workers and communicating professionally during her time with NHS and during post-termination work with another employer. Such incidents include the following: (A) in June 2007, Taunton received a verbal warning for raising her voice during an argument with a co-worker; (B) around September 2008, Gandy counseled Taunton about using a boisterous, loud voice that could be perceived as disrespectful; (C) also in September 2008, Gandy conducted a peer review of Taunton's co-workers, and received feedback from them that Taunton had a poor attitude and was not a team player; (D) Taunton's annual evaluation at the end of September 2008 reflected that she needed to improve her behavior and tone to appear less "blunt," "loud," and "aggressive"; (E) after receiving complaints about Taunton from different sources, on or about March 23, 2009, Davis and Harlan met with Taunton and instructed her to take advantage of NHS's Employee Assistance Program ("EAP"); (F) around May 2010, an African American Patient Care Technician reported that she was scared to work with Taunton, and Taunton's supervisors warned Taunton about her demeaning behavior; (G) around December 2011, a subsequent employer advised Taunton to use its EAP, and Taunton resigned from that job rather than take advantage of the offered EAP.

Taunton refused to participate in the EAP benefit after the 2009 instruction from NHS about EAP benefits, but received no negative consequences for that refusal. As a result of that instruction, Taunton did seek and receive counseling from her pastor, and she characterized that counseling as helpful.

On September 10, 2009, Taunton received an annual evaluation that stated, among other things, that her "interactions with others has much improved" and that "Benita is working to

build a constructive and cooperative relationship with other staff members."

*First Charge of Discrimination*

Plaintiff filed a Charge of Discrimination with the EEOC on October 28, 2009, asserting

discrimination based on race and religion, and retaliation for protesting of racial and religious

discrimination. In that charge she stated:

> I am Black and I was hired by the above named employer September 10,
> 1999, as an LPN.  I was promoted to an RN in May 2008.  On March 17,
> 2009, I had to report to management because some had accused me of
> being angry on the job, which [sic] deny.  I was told that I had to go to
> Employee Assistance Program (EPA).   I told my employer that I could talk
> with my pastor if I need to talk with someone.  I told management that it
> was against my religious belief to confide in another source.  I told
> management that I did not believe in EPA.  Since March 23, 2009, and
> continuing, I have been subjected to different terms and conditions of
> employment.  I am one of four Black nurses that are held to more [rigid]
> standards than White nurses.  Black nurses continued to be assigned to the
> most difficult patients.  Since other Black nurses have filed charges of
> discrimination, management will approach me only out of necessity.  As of
> October 26, 2009, White nurses continue to receive preferential treatment
> in the work place.
>
> I believe that I was discriminated against because of my race, Black, and in
> retaliation for protesting my employer trying to force me to go to EPA,
> against my religious belief, in violation of Title VII of the Civil Rights Act
> of 1964, as amended.  My employer as of October 26, 2009, affords White
> nurses more flexibility in the performance of their job duties without fear of
> being disciplined.

(Doc. 20-3, at 82).

In her deposition testimony, Taunton explained what she meant by alleging different

terms and conditions of employment as to black and white workers, pointing to the following

conduct: (1) supervisors' failure to enforce against white workers the policy against using mobile

phones on the floor; (2) supervisors' failure to enforce against white workers the rule that staff

cannot wear hoodies on the floor; (3) supervisors' failure to enforce the rule that nurses cannot be

4

in the room where charge nurses make patient assignments by allowing in that room three white nurses, but no black nurses and not all the white nurses working at the time; (4) supervisors' failure to enforce the policy against profanity in the work place by not disciplining two white nurses who used profane language on the floor; and (5) supervisors' failure to discipline one white nurse for reading on the floor.  Taunton acknowledged, however, that she had never committed those particular infractions, and thus, she had never received discipline on those matters.

The only other conduct that Taunton identified as disparate treatment, as opposed to retaliation, in either her Second Amended Complaint or her deposition involved (1) an incident with a patient's relative, referred to as "S.C."; and (2) a patient assignment.  The incident with S.C. occurred on April 20, 2010 when S.C., who was black, chest-butted Taunton at work.  The undisputed facts reflect that Nurse Manager Austin detained S.C. in her office soon after the incident and stationed a security guard outside the office to ensure that S.C. remained there until arrangements could be made for her safe exit.  Taunton went to the doctor, completed a report of injury, and returned to work upon her release from care on April 27, 2010. DCS Davis advised Taunton that the patient's sister would not be allowed to visit the hospital while Taunton was on duty, and Taunton never saw the sister again.  As a result of the chest-butting incident, Taunton did not lose pay and received no discipline.

The final matter identified as disparate treatment occurred on only one occasion in early 2009 when Taunton was assigned a fifth patient while the LPN on duty only had four patients. Taunton complained to a Charge Nurse named Amy about having more patients than the LPN. Taunton explained in her deposition that when she was an LPN under different management, the

LPNs were generally assigned more patients than RNs.  The facts presented do not clarify whether the LPN in question was white.  Taunton acknowledged, however, that no policy exists dictating that an LPN must receive the first patient during a shift or the first additional patient during a shift, to ensure that the LPNs always have more patients at any given point.  Further, Taunton acknowledged that the LPN in question had been scheduled to receive a fifth patient, but, for some reason, the patient did not materialize.  She also acknowledged that NHB generally assigns to nurses patients whose rooms are close together, and on that occasion, the fifth patient's assigned room was nearby the rooms of Taunton's other patients.  Finally, Taunton acknowledges the assignment of additional patients did not affect her pay.

### *Monkey Doll Incident*

In February of 2010, as Taunton was passing by the open door to Austin's office, Taunton saw a stuffed animal monkey doll on a light fixture in that office.  Austin never drew Taunton's attention to the doll.  The monkey had a light brown face and a dark brown body and wore a bluish green surgical mask and a bluish green shirt.  The back of the shirt reads "Cleaning Surgical Instruments is Serious Monkey Business.  Ruhof" with the word "Monkey" crossed through.  The monkey doll was a promotional item from Ruhof Corporation, which provides cleaning supplies.  NHS's Director of Infection Control/Hospital Division had received the doll at a national conference on infection control and gave it to Austin.  Taunton knew of a Patient Care Technician ("PCT") who had won a similar stuffed animal at an in-service educational seminar, and the PCT explained to her that the monkey was to promote infection control.

The monkey offended Taunton because, as she testified in her deposition, she understands that white people often refer to black people as monkeys.  She acknowledged, however, that she

6

has never heard NHS employees make derogatory racial remarks or refer to black people as monkeys. She further acknowledges that if Austin had brought the monkey to the nurses' station and explained that it was a promotional item from Ruhof, she would not have been offended. No one told her the monkey was meant to depict her or other black employees or that any connection existed between her EEOC Charge and the monkey's presence.

Taunton did not report her concern about the monkey doll to Austin or Davis at that time. Further, she did not report her concern to anyone identified in the employee handbook as the appropriate person to handle communications about discrimination concerns.

On April 16, 2010, the EEOC received Taunton's second EEOC Charge referring to the monkey as a retaliatory act as further described below. When NHS learned about Taunton's claim in the second charge, NHS ordered Austin to remove the monkey, although the company took the position that no basis existed for Taunton's charge that the doll's display represented a discriminative or retaliatory act. Austin complied with the order, and removed the monkey. Taunton acknowledges that she never saw the monkey after Easter of 2010 and certainly did not see the monkey towards the end of April 2010 or afterwards.

*Second Charge of Discrimination*

In Taunton's April 2010 charge of discrimination, she marked boxes for discrimination based on race, color, and retaliation, explaining as follows:

> This amended EEOC charge relates back to my original charge of racial discrimination. Subsequent to filing my original EEOC charge, I have been retaliated against by my Employer and its agents, such as but not limited to nurse managers and supervisors. This retaliation included but was not limited to incidents that happened on February 26, 2010. On or about February 26, 2010, Melissa Austin, nurse manager placed a monkey dressed in a nurse outfit on top of her desk in clear and plain view of the black nurses at Noland. The monkey dressed [sic] the nurse's outfit in the nurse manager's office is racially offensive

and creates a racially hostile work environment.

(Doc. 20-3).

In May of 2010, Dr. Ross, one of the doctors under whom Taunton worked, stopped her in the hall and asked how she was doing. He indicated that he had heard she had communicated with the EEOC and asked her what had been going on. When she advised him that incidents had happened such as patient assignments that she felt were discriminatory, Dr. Ross told her that he would prefer that she discuss her issues with him instead of going to the EEOC. Dr. Ross did not threaten Taunton or her employment in any way and never spoke to her about her discrimination charge again.

### *The Incident Allegedly Causing Termination*

The incident to which NHS points as causing Taunton's termination occurred on June 9, 2010, when Patient S was assigned to Taunton's care. Taunton initially assessed Patient S between 9:30 am and 10:00 a.m. of that day. At that time, Taunton did not note anything abnormal. Taunton claims she took another blood pressure reading around noon, and, at that time, the reading was "119 over something." When Taunton again took Patient S's blood pressure at around 1:00 p.m., she measured his blood pressure at 105/45. Diastolic blood pressure of 45 is abnormally low, and this change in blood pressure represented a significant change in Patient S's condition. Taunton did not recheck the reading or perform any other reassessment of Patient S at that time, and withheld Patient S's blood pressure medicine because of his low blood pressure. Taunton did not tell Patient S's physician, Dr. Ross, that the patient's blood pressure had dropped or that she had withheld the medication, although she should have shared this information with the doctor. Patient S subsequently coded, could not be resuscitated, and was

8

pronounced dead at 2:02 p.m.

Laura Wills entered Patient S's room during the code and resuscitation efforts and investigated Patient S's deterioration and death. She saw a lot of blood from the patient's bowels and noted that the blood had an odor of iron that is distinctive and recognized by most health care professionals as indicating a gastrointestinal bleed.  After interviewing Taunton and without input from Davis, Austin, or Dr. Ross, Wills recommended to NHS's Human Resources that Taunton be terminated for her failure to reassess Patient S when his condition changed and for the accompanying failure to inform the physician of the change in condition. According to basic nursing knowledge and NHS policy, a nurse should reassess a patient when a change of condition occurs.  A reassessment permits the nurse to evaluate possible causes for the dip in blood pressure – including dangerous ones – and assess the risks.  Wills received approval and terminated Plaintiff on June 15, 2010.

Plaintiff filed the instant suit on February 2, 2011.

## STANDARD OF LAW

Summary judgment is proper under Rule 56 of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[A] party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying [the evidence that demonstrates] the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323. After the moving party demonstrates an absence of evidence to support the nonmoving party's case, the nonmoving party "must do more than simply show that there is some

9

metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact." *Anderson*, 477 U.S. 247-48. A dispute of material fact is genuine if a reasonable jury, applying the relevant law to the evidence presented, could return a verdict for the nonmoving party. *See Wright v. Sanders Lead Co.*, 2006 WL 905336, *8-9 (M.D. Ala. 2006) *aff'd*, 217 Fed. App'x 925 (11th Cir. 2007) (citing *Barfield v. Brierton*, 883 F.2d 928, 933 (11th Cir. 1989)).

When considering a motion for summary judgment, a court must view the facts "in the light most favorable to the non-moving party . . . ." *Harris*, 127 S. Ct. at 1776. The court does not "weigh the evidence and determine the truth of the matter" but rather, simply focuses on whether a genuine issue of material fact exists. Anderson, 477 U.S. at 249. Where a reasonable fact finder may "draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd. of Public Educ. for Bibb County*, 495 F.3d 1306, 1315 (11th Cir. 2007). '[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.

10

<u>DISCUSSION</u>

Plaintiff's Second Amended Complaint contains four counts, alleging as follows: Count One - race discrimination in working conditions, brought pursuant to Title VII; Count Two - race discrimination in working conditions, brought pursuant to Section 1981; Count Three- retaliatory termination and retaliation in the form of Austin's displaying a monkey dressed in a nurse's outfit that was racially offensive to Taunton, both as a result of Taunton's complaints of race discrimination, brought pursuant to Title VII; and Count Four - racially hostile work environment. NHS argues in its Motion that, based on the facts established during discovery and presented in its brief, no genuine issues of material fact exist, and NHS is entitled to judgment as a matter of law. As noted previously, Taunton's failure to address the facts in Defendant's brief allows the court to consider those facts as undisputed for purposes of this motion and to grant summary judgment if those undisputed facts show that NHS is entitled to judgment as a matter of law.

To prevail on her claims under Title VII, the Plaintiff must demonstrate that her race "was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(a) and 41 U.S.C. § 2000e-2(m). Plaintiff may prove that race was a motivating factor by direct or circumstantial evidence. *See Hall v. Alabama Ass'n of School Bds.*, 326 F.3d 1157, 1165 (11th Cir. 2003)(per curiam). In the instant case, Plaintiff provided no direct evidence of racial discrimination. The allocation of proof in cases where a Plaintiff relies on circumstantial instead of direct evidence of discrimination shifts in accordance with the three-step order of proof established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1972).

In the first *McDonnell Douglas* step, Taunton must produce evidence demonstrating that

11

she can establish a *prima facie* case, thus giving rise to the presumption that the employer

discriminated against her in the employment action made the basis of the lawsuit. *See St. Mary's*

*Honor Center v. Hicks*, 509 U.S. 502, 506 (1993). In step two, the employer must rebut this

presumption by producing a legitimate, non-discriminatory reason for the employment action. *St.*

*Mary's Honor Center*, 509 U.S. at 509. The employer's "burden is one of production, not

persuasion; it can involve no credibility assessment." *See Reeves v. Sanderson Plumbing Prod.,*

*Inc.*, 530 U.S. 133, 142 (2000) (quoting  *St. Mary's Honor Center*, 509 U.S. at 509). If the

employer meets its burden of production, then in the final step, Taunton has the burden of

responding with evidence that the employer's reason was not a true one but rather, was a pretext

for discrimination. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).

Throughout this three-step analysis, the burden to prove discrimination remains upon Taunton's

shoulders. *See Morris v. Emory Clinic, Inc.*, 402 F.3d 1076, 1081 (11th Cir. 2005) (per curiam).

### Counts One & Two: Disparate Treatment Claim

The claims in Counts One and Two of Taunton's Complaint assert disparate treatment

based on race. Although Count Two is brought pursuant to Section 1981 instead of Title VII,

courts apply the same analytical framework to claims brought under Section 1981 as those

brought under Title VII; therefore, the court will address in tandem the claims in both counts.

*See Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 843 n. 11 (11th Cir. 2000) (stating that

courts apply the *McDonnell Douglas* framework to Section 1981 claims).

To establish Taunton's  *prima facie* case under the *McDonnell Douglas* paradigm for this

claim, she must show  "(1) she is a member of a protected class; (2) she was subjected to adverse

employment action; (3) her employer treated similarly situated employees outside of her

protected class more favorably than she was treated; and (4) she was qualified to do the job."

*Burke-Fowler v. Orange Cty*, 447 F.3d 1319, 1323 (11th Cir. 2006).

NHS argues that, as to all other alleged disparate treatment *other than her termination itself,* Taunton has not established the second element because the conduct to which she objects fails to rise to the level of "adverse employment action." This court agrees. An adverse action must represent "a serious and material change in the terms, conditions, or privileges of employment" and have a tangible adverse effect on the Plaintiff's employment. *Crawford v. Carroll*, 529 F.3d 961, 970-971 (11th Cir. 2008); *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001). The alleged adverse action must be one that would be judged materially adverse to a reasonable person under the same circumstances. *Davis*, 245 F.3d at 1239-40.

The court must then examine the conduct to which Taunton objects to determine whether that conduct constitutes an adverse action. In her deposition testimony, Taunton specifies the conduct to which she objects. She acknowledges that most of the conduct to which she objects (i.e. discipline allegedly applied disparately regarding cell phone use, hoodies, nurses' presence during assignments, profanity, reading) *was not discipline discriminatorily enforced against her personally*. Taunton did not engage in any of these behaviors and NHS did not discipline her for them. In other words, most of the conduct she identifies is alleged disparate treatment of *others* but not of Taunton *herself*. Disparate treatment of others does not fall within the definition of an "adverse action"; it is not "a serious and material change in the terms, conditions, or privileges of [Taunton's] employment" and does not have a tangible adverse effect on her employment. *Crawford,* 529 F.3d at 970-971; *Davis*, 245 F.3d at 1239; *see also Entrekin v. City of Panama*

13

*City,* 376 Fed. Appx. 987, 995 (11th Cir. 2010) ("[The employer's] failure to take action against other individuals does not constitute an adverse employment action, because [plaintiff] herself suffered no harm.").  Taunton's theories of favorable racial treatment based on behaviors in which she did not engage or on policies for which she received no discipline cannot constitute an adverse employment action as to Taunton.  Therefore, the court finds that to the extent Taunton relies on conduct that represents disparate treatment of others to establish an adverse action, she fails to establish that element of her *prima facie* case.

Taunton identifies only three actions that represented alleged treatment of her personally. The first involved action by a third party, a patient's sister, and the undisputed facts reflect no action of NHS that falls within the meaning of adverse employment action.  The second action was based on Taunton's assertion that on a single occasion in March 2009, she received an additional patient that she believes should have been assigned to an LPN, because the LPN had only four patients and the assignment raised Taunton's patient load to five.  The facts presented to the court indicate that the assignment schedule called for both Taunton and the LPN to receive five patients but one of the LPN's patients did not materialize. As Taunton acknowledged in her deposition testimony, no policy exists dictating that an LPN must receive the first patient during a shift or the first additional patient during a shift, and Taunton has not presented any facts establishing that she lost pay or benefits or prestige or otherwise establishing that this one assignment during one shift falls within the definition of "adverse employment action."  The third action was her termination.   Therefore, the court finds that with the exception of her termination, none of the actions identified in Taunton's Second Amended Complaint or deposition testimony constitutes an adverse employment action, and Taunton has failed to

establish that element of her *prima facie* case.

As an alternative ruling on all claims of racial discrimination except her termination, the court also finds that Taunton has failed to establish the third element of her *prima facie* case, because Taunton has presented no facts tying the patient assignment to her race.  Taunton has not presented facts at summary judgment establishing the race of the LPN in question.  Further, even if she had established that the LPN were white, the facts presented reflect that the patient assignment schedule provided for both the LPN and Taunton to receive five patients, but the LPN's fifth patient did not materialize.  Thus, Taunton has not established that disparate treatment based on race existed.  The court notes that nondiscriminatory reasons for the assignment exist, including the most obvious one: that the extra patient's room was nearby the rooms of Taunton's assigned patients, and that, as Taunton also acknowledged, NHB has a general practice of making such assignments to nurses whose patients are close together.  Without evidence linking the assignment to race, the evidence presented suggests that this decision was a lawful exercise of Defendant's business judgment. *See Davis*, 245 F.3d 1232, 1244 ("Work assignment claims strike at the very heart of an employer's business judgement and expertise because they challenge an employer's ability to allocate its assets . . . ."). As the Eleventh Circuit has repeatedly acknowledged, courts are not in the business of serving as "'a super-personnel department'" to re-examine the employer's business judgments and second-guess whether they were fair and appropriate.  *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1092 (11th Cir. 2004) (quoting *Lee v. GTE Fla, Inc.*, 226 F.3d 1249, 1254 (11th Cir. 2001).  Neither are "Title VII's remedial mechanisms designed to address petty slights and minor annoyances" such as having to put up with one more patient on one occasion than the LPN down

the hall.  *See Burlington*, 548 U.S. at 68 (stating that "[n]ormally petty slights, minor annoyances, and simple lack of good manners" are not employer actions that are prohibited).  Rather, the court's role at this juncture is to determine whether Taunton has presented facts establishing her *prima facie* case.

As to Taunton's claims for racial discrimination regarding her termination, the court notes that although she refers to her termination in Count One, she describes it as a *retaliatory* act.  Because Taunton did not respond to the motion for summary judgment, the court had no brief from her to clarify whether she intended to include her termination as part of her claims in Count One.  To the extent, if at all, that Taunton intended to do so, the court finds that Taunton has failed to establish evidence supporting element three because she has produced no evidence of a similarly situated white employee who was not terminated.  She provided no such evidence in her deposition testimony and she provided no response to the motion for summary judgment, failing to file evidence opposing summary judgment.  As to all claims of racial discrimination in Counts One and Two, the court finds that Taunton has not established the third element of her *prima facie* case, and thus, the motion for summary judgment is due to be granted.

In sum, for all of these reasons, summary judgment is due to be GRANTED on the disparate treatment claims in Counts One and Two.

**Count Three: Retaliation**

In Count III, Taunton asserts that NHS retaliated against her in two ways: (1) by displaying a monkey doll that offended her; and (2) by terminating her employment.  The Eleventh Circuit has explained that "[a] prima facie case of retaliation contains three elements: first, the plaintiff engaged in statutorily protected conduct; second, the plaintiff suffered an

16

adverse employment action; and finally, the adverse action was causally related to the protected expression." *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1291 (11th Cir. 2002). The court agrees with NHS that summary judgment is due to be granted on her retaliation claims for the reasons stated below.

### A. Monkey Doll

As to Taunton's assertion that Austin's display of a monkey doll in her office constituted retaliation for Taunton's filing an EEOC charge, NHS argues that Taunton has failed to establish the second and third elements of her *prima facie* case; she has not presented evidence that the display was an adverse action and that, in any event, a causal connection existed between the charge and the display. The court is not convinced that Taunton has presented facts demonstrating that any link existed between race and the monkey display. The doll was located in Austin's office, and neither explicitly targeted towards Taunton nor said to represent her. The evidence reflects that the monkey was dressed in medical gear, but Austin, the owner of the monkey doll, is white and wears medical gear. The evidence further reflects that the monkey was simply a promotional doll for medical cleaning supplies that someone gave Austin.

Taunton bases her claim that the monkey doll is related to her race solely upon historical derogatory references to black as "monkeys," although she admits that she never experienced any racially derogatory comments at NHS, that NHS employees did not refer to black people as monkeys, and that no one at NHS told her the monkey doll was meant to depict her or other black nurses. Significantly, Taunton acknowledges in her deposition that if Austin had brought the monkey to the nurses' station and explained that it was a promotional doll, she would not have been offended.

The court recognizes that Taunton was offended by the monkey because she speculated that Austin displayed it to insult her.  However, under the Eleventh Circuit's definition of Title VII retaliation, Taunton must do more than prove that she was subjected to actions that she subjectively considered offensive.  Rather, as the Supreme Court explained in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56-57 (2006), a plaintiff must present facts showing that the defendant committed actions that are "harmful to the point they could well dissuade a reasonable worker from making or supporting a charge of discrimination."  The court finds that, under the circumstances presented, displaying a monkey doll promoting medical cleaning equipment in a supervisor's office does not meet that standard; that action would not dissuade a reasonable worker from filing an EEOC charge, and indeed, even Taunton herself acknowledged that if she had understood that the monkey was a promotional doll, she herself would not have been offended. The court finds that Taunton has not met her *prima facie* case on this claim.

Even assuming *arguendo* that Taunton could establish that the display would somehow dissuade a reasonable worker from making an EEOC charge,  Taunton fails to establish that a causal connection existed between her filing a Charge of Discrimination in October of 2009 and the display of the monkey doll in February of 2010.  This four month temporal connection, without more, cannot create an inference of causation sufficient to establish a *prima facie* case of retaliation. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (stating that the temporal proximity must be "very close" to establish evidence of causality and citing *Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10 Cir. 2001) (holding 3-month period insufficient) and *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (7th Cir. 1992) (holding 4-month period insufficient)).  For all the above reasons, the court finds that Taunton has failed to establish her

*prima facie* claim as to the monkey claim.

   B.  *Retaliatory Termination*

Taunton's second retaliation claim in Count Three is based upon her termination.  In its brief, NHS assumes *arguendo* that Taunton can establish a *prima facie* case of retaliatory termination.  However, NHS has come forward with a legitimate non-retaliatory reason for the discharge – her failure to reassess Patient S after his condition changed significantly – as required under the familiar burden-shifting framework.  *See Olmsted v. Taco Bell Corp.,* 141 F.3d 1457, 1460 (11th Cir. 1998)).  Accordingly, to avoid summary judgment, Taunton must "meet [the employer's proffered legitimate reason] head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transport,* 229 F.3d 1012, 1030 (11th Cir. 2000).

In the instant case, Taunton filed no response to the motion for summary judgment, and thus, the court does not have the benefit of a brief pointing it to potential evidence of pretext.  In her deposition, Taunton presented a stray remark by Dr. Ross, who was not a decision maker in her termination.  The undisputed evidence reflects, however, that Wills, a neutral decision maker, conducted a thorough investigation and found that Taunton had failed to reassess Patient S's condition when she should have done so.  Of course, Patient S subsequently died, and NHS terminated Taunton and gave as a reason her failure to provide proper care to Patient S.  Thus, NHS presented a legitimate non-retaliatory business reason for terminating Taunton's employment.

To the extent that Taunton's deposition testimony about the stray remark could be said to point to Dr. Ross's remark as evidence that the reason for her termination was pretextual, the

court finds that Taunton has failed to meet the proffered reason "head-on" and rebut it.  For example, she has presented no evidence of a similarly situated white comparator who committed the same or similar conduct but was not terminated, or evidence that Dr. Ross had input into the termination decision.  Therefore, summary judgment is due to be GRANTED on the retaliatory termination claim.

For all of the above reasons, the court finds that summary judgment is due to be granted on all claims of retaliation set forth in Count Three.

### Count Four: Racially Hostile Work Environment Claim

As to the claim in Count Four asserting a racially hostile work environment, Taunton has failed to establish her *prima facie* case. To establish such a claim, a plaintiff must show: "(1) that [she] belongs to a protected group; (2) that [she] has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee . . .; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).  For the reasons explained below, Taunton has failed to establish that any alleged harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment. Further, the court finds that the evidence demonstrates NHS took timely and appropriate corrective action when it was notified of the offending conduct.

NHS argues that Taunton has failed to establish that the conduct she complains of – the display of a stuffed monkey doll – is severe or pervasive for the purposes of her claim. The

following factors are considered in evaluating whether conduct is severe or pervasive: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Miller*, 277 F.3d at 1275 (11th Cir. 2002). Further, the complained of conduct must be both subjectively and objectively hostile. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 809 (11th Cir. 2010); *see Harrington v. Disney Reg'l Entm't, Inc.*, 276 Fed. Appx. 863, 876 (11th Cir. 2007) (finding fact that plaintiff's black co-workers were occasionally referred to as "monkeys"and she was described as "ghetto" was not sufficient to establish a hostile work environment); *Quarles v. Con-Way Freight, Inc.*, 2008 WL 1994916 at *8 (M.D. Fla. 2008) (finding presence of a stuffed animal gorilla, who appeared to have been named in reference to a black supervisor, and a noose in the workplace, where the incidents were not directed at the plaintiff,  was not sufficiently severe and pervasive); *Coley v. Fortson-Peek Co.*, 2011 WL 4899752, **9, 27 (M.D. Ga. 2011) (finding that no hostile environment existed where co-worker "showed [plaintiff] a picture on his phone of a monkey and told [plaintiff] that he looked like a monkey.").

In this case, the monkey doll was not physically threatening; it was located inside a supervisor's office and neither the supervisor nor any other employee called Taunton's attention to it; it was the only item or potential symbol of its kind in the workplace about which Taunton complains; it was not accompanied by racial slurs or other overt expressions of racial animus; no NHS supervisor or manager expressed or implied a connection between the doll and Taunton or other black workers; and the doll's clothing both reflected its function as a promotional item and explained the connection between the monkey and the company promoted.  Under these

21

circumstances, no reasonable jury could find the work environment at NHS to be *objectively* hostile nor could it find the conduct to be severe and pervasive.  Accordingly, the court finds that the motion for summary judgment is due to be GRANTED as to the claim in Count Four for racially hostile work environment.

As an alternative ruling, the court finds that even if the presence of the stuffed monkey doll somehow could be perceived as severe or pervasive conduct and created a racially hostile work environment, the court finds sufficient evidence to demonstrate that NHS took timely and appropriate corrective action to establish the *Faragher/Ellerth* defense. The *Faragher/Ellerth* defense "'comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any [racially] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer. . . .'" *Walton v. Johnson & Johnson Serv., Inc.*, 347 F.3d 1272, 1286 (11th Cir. 2003), *cert. denied*, 124 S. Ct. 1714 (2004) (quoting one of the two cases establishing the defense, *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)).

An employer satisfies the first part of the *Faragher* defense through its dissemination and promulgation of an anti-harassment policy, thereby providing a mechanism to encourage employees to report harassment and providing alternative routes to direct those reports. *Walton*, 347 F.3d at 1286.  NHS has policies prohibiting discrimination, harassment and retaliation that are communicated to its employees in its Employee Handbook, among other places. Taunton received these policies, which explain that this conduct can be reported to the facility's Administrator or Vice President of Human Resources.

The second part of the *Faragher* defense is satisfied if the employee unreasonably fails to

take advantage of any preventive or corrective opportunities provided by the employer. *Walton*, 347 F.3d at 1286. "An employee's failure to take advantage of preventive or corrective measures can take two forms – not using the procedures in place to promptly report any harassment and not taking advantage of any reasonable corrective measures the employer offers after the harassment is reported." *Baldwin v. Blue Cross/Blue Shield*, 480 F.3d 1287, 1306 (11th Cir. 2007).

Before filing her second EEOC Charge, Taunton took no action to complain about the doll, or to communicate with Austin about how the doll offended her.  She did not directly or indirectly request that Austin remove it prior to bringing the EEOC Charge.   Taunton testified that her only reason for not bringing this complaint to the individuals designated in NHS's policy was because she planned to bring an EEOC Charge. However, filing an EEOC Charge does not substitute for using the employer's procedures to remedy the offensive conduct.  Even if Taunton's second EEOC Charge were considered a proper and timely "report" for the purposes of the *Faragher-Ellerth* defense, then the second prong of that defense is satisfied when the employer takes appropriate corrective action. *See Watson v. Blue Circle*, 324 F.3d 1252, 1261 (11th Cir. 2003). Although NHS did not find that the doll was discriminatory, harassing, or retaliatory, upon learning of her EEOC Charge that Taunton so perceived it, NHS ordered Austin to remove it from the workplace, which she did. The EEOC received Taunton's Charge on April 16, 2010, and Taunton acknowledges that she never saw the monkey after Easter of 2010 and that it was definitely gone by the end of April.  Those facts establish that NHS removed the monkey promptly after it received notice of the EEOC Charge.

Therefore, because Taunton has failed to establish a *prima facie* case of a hostile work environment claim, and alternatively because Defendant has established a *Faragher/Ellerth*

defense, summary judgment is due to be GRANTED on the hostile work environment claim.

<u>CONCLUSION</u>

In summary, the court finds that summary judgment is due to be GRANTED as to all Taunton's claims.  The court  will enter a separate order consistent with this Memorandum Opinion.

Dated this 7th day of November, 2012.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

24